# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BOONLEUANG SENGSOURIGNET,<br><br>        Plaintiff,<br><br>    v.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>        Defendant. | Case No. 1:20-cv-01834-SAB<br><br>ORDER DENYING PLAINTIFF'S SOCIAL<br>SECURITY APPEAL<br><br>(ECF Nos. 18, 19) |

## I.

## INTRODUCTION

Boonleuang Sengsourignet ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits pursuant to the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]  Plaintiff submits that the ALJ erred in: (1) finding Plaintiff did not have a severe impairment; (2) in failing to assess Plaintiff's subjective pain complaints; and (3) failing to evaluate and weigh the opinion of Plaintiff's treating physicians and only considering the opinion of the consultative examiner.  For the reasons set forth below, Plaintiff's Social Security appeal shall be denied.

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge.  (See ECF Nos. 7, 10, 11.)

## II.

## BACKGROUND

### A.   Procedural History

Relating to an earlier application, Plaintiff had a hearing before Administrative Law Judge Stephen Webster on September 22, 2009, and a prior hearing on October 26, 2005.  (AR 77.)  In the October 26, 2005 hearing, it was found that Plaintiff retained a residual functional capacity to perform simple repetitive tasks and was not disabled.  (AR 77.)  In the September 22, 2009 hearing, Judge Stephen Webster applied AR 97-4(9) and found that Plaintiff did not rebut the presumption of continuing non-disability.  (AR 77.)  In the 2009 hearing decision, Judge Stephen Webster found the Plaintiff had the medically determinable impairments of depression and posttraumatic stress disorder.  (AR 83.)  That decision relied on a consultative examination by Dr. Steven Swanson in December of 2007, which opined that Plaintiff "appeared motivated to make a disability case."  (AR 85.)

As to the instant matter, Plaintiff re-applied for Title XVI Supplemental Security benefits on April 17, 2018,[2] alleging disability beginning July 1, 2015.  (AR 210.)  Plaintiff's application was initially denied on July 6, 2018, and denied upon reconsideration on October 29, 2018.  (AR 94, 104.)  Plaintiff requested and received a hearing before Administrative Law Judge Lynn Ginsberg ("the ALJ").  Plaintiff appeared for the hearing with the assistance of a Laotian interpreter, and represented by counsel, on April 27, 2020.  (AR 27-40.)[3]  On May 27, 2020, the ALJ issued a decision finding that Plaintiff was not disabled.  (AR 12.)[4]  The Appeals Council denied Plaintiff's request for review on June 25, 2020.  (AR 206.)

On December 30, 2020, Plaintiff filed this action for judicial review.  (ECF No. 1.)  On

---

[2]  Defendant and the ALJ refer to an application filing date of March 28, 2018.  (AR 15, 22.)  Plaintiff's brief refers to April 17, 2018.  The filing in the record states that Plaintiff applied on April 17, 2018.  (AR 210.)

[3]  Defendant's recitation of the procedural history mistakenly refers to a "September 22, 2019" hearing, apparently referencing the September 22, 2009 hearing (AR 41-72), rather than the April 27, 2020 hearing (AR 27-40).

[4]  The ALJ signed the opinion on May 27, 2020, and the cover letter contains the same date.  (AR 12, 22.)  Plaintiff states the decision was issued on May 21, 2020 (Br. 2), whereas Defendant states the ALJ's decision was issued on March 23, 2020 (Opp'n 6).  The May 21, 2020 date appears to derive from the table of contents of the administrative record.

August 27, 2021, Defendant filed the administrative record ("AR") in this action.  (ECF No. 12-1.)  On December 30, 2021, Plaintiff filed an opening brief.  (Pl.'s Opening Br. ("Br."), ECF No. 18.)  On January 31, 2022, Defendant filed an opposition brief.  (Def.'s Opp'n ("Opp'n"), ECF No. 19.)  Plaintiff did not file a reply brief.

**B.      The ALJ's Findings of Fact and Conclusions of Law**

The ALJ made the following findings of fact and conclusions of law as of the date of the decision, May 27, 2020:

- Plaintiff has not engaged in substantial gainful activity since March 28, 2018, the application date.

- Plaintiff has the following medically determinable impairments: hypertension, diabetes mellitus, osteopenia, cataract, history of right nephrectomy, degenerative changes of the left knee, internal hemorrhoids, and depression.

- Plaintiff does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, the Plaintiff does not have a severe impairment or combination of impairments.

- Plaintiff has not been under a disability, as defined in the Social Security Act, since March 28, 2018, the date the application was filed.

(AR 15-22.)

**III.**

**LEGAL STANDARD**

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled.  20 C.F.R. §

404.1520;[5] <u>Batson v. Commissioner of Social Security Administration</u>, 359 F.3d 1190, 1194 (9th Cir. 2004).   The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

<u>Stout v. Commissioner, Social Sec. Admin.</u>, 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits.   42 U.S.C. § 405(g).  In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error."   <u>Hill v. Astrue</u>, 698 F.3d 1153, 1158 (9th Cir. 2012).   "Substantial evidence" means more than a scintilla, but less than a preponderance.   <u>Smolen v. Chater</u>, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted).   "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion."   <u>Thomas v. Barnhart</u>, 278 F.3d 947, 955 (9th Cir. 2002) (quoting <u>Flaten v. Sec'y of Health & Human Servs.</u>, 44 F.3d 1453, 1457 (9th Cir. 1995)).

---

[5] The cases generally cited herein reference the regulations which apply to disability insurance benefits, 20 C.F.R. §404.1501 et seq., however Plaintiff is also seeking supplemental security income, 20 C.F.R. § 416.901 et seq.  The regulations are generally the same for both types of benefits.

1   "[A] reviewing court must consider the entire record as a whole and may not affirm
2   simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting
3   Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006). However, it is not
4   this Court's function to second guess the ALJ's conclusions and substitute the court's judgment
5   for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is
6   susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be
7   upheld.").

8                                              **IV.**

9                              **DISCUSSION AND ANALYSIS**

10      Plaintiff argues the ALJ erred in: (1) finding Plaintiff did not have a severe impairment;
11   (2) failing to properly assess Plaintiff's subjective pain complaints; and (3) failing to evaluate
12   and weigh the opinions of Plaintiff's treating physicians and only considering the opinion of the
13   consultative examiner.

14      **A.      Whether the ALJ Erred at Step Two**

15      Plaintiff argues the ALJ erred in finding Plaintiff did not have a severe impairment.

16      1.      General Legal Standards

17      "An impairment or combination of impairments can be found 'not severe' only if the
18   evidence establishes a slight abnormality that has 'no more than a minimal effect on an
19   individual['s ability to work.' " Smolen, 80 F.3d at 1290 (citations omitted). Step two is a "de
20   minimis screening devise to dispose of groundless claims." Id., 80 F.3d at 1290. An ALJ can
21   only find that claimant's impairments or combination of impairments are not severe when his
22   conclusion is clearly established by medical evidence. Webb v. Barnhart, 433 F.3d 683, 687 (9th
23   Cir. 2005) (quoting S.S.R. 85-28). In considering an impairment or combination of impairments,
24   the ALJ must consider the claimant's subjective symptoms in determining their severity.
25   Smolen, 80 F.3d at 1290.

26      Symptoms are not medically determinable physical impairments and cannot by
27   themselves establish the existence of an impairment. Titles II & XVI: Symptoms, Medically
28   Determinable Physical & Mental Impairments, & Exertional & Nonexertional Limitations, SSR

96-4P (S.S.A. July 2, 1996).  In order to find a claimant disabled, there must be medical signs and laboratory findings demonstrating the existence of a medically determinable ailment.  Id. "[R]egardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings. . . .  In claims in which there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment, the individual must be found not disabled at step 2 of the sequential evaluation process."  Id.

2.    Plaintiff's Challenges

Plaintiff submits the ALJ erred in concluding her lumbar spine degenerative disc disease was non-severe, by relying on the Consultative Examination of Dr. Swanson (the "CE"), that noted Plaintiff ambulated independently without an assistive device, and then immediately applied the CE's opinion that Plaintiff was "motivated to make a case for disability."  (AR 19.) Plaintiff argues the ALJ failed to address treatment for neck pain, lower back pain, and knee pain, along with imaging that showed an objective basis for her pain, observable symptoms, and subjective pain complaints.  (Br. 9.)  Plaintiff acknowledges the ALJ did reference findings on imaging, however, only the portions that showed "minimal" and "mild" chronic changes. Plaintiff contends the ALJ did not mention the spurs on the patella nor the irregularity of the patella, noting the imaging showed "only scattered degenerative changes of the left knee."  (AR 20.)

Plaintiff states the ALJ did not consider straightening of her cervical spine.  For example, while a December 19, 2019 x-ray's impression stated: limited motion, mild degenerative disease, and straightening of the cervical spine, the ALJ only noted the "mild findings."  (AR 20.) Plaintiff emphasizes that "straightening of the cervical lordosis impacts the biomechanics of the entire spine; it makes it vulnerable to injury, impairs its ability to support the weight of the head, places added pressure on the spinal discs (speeding up disc degeneration), and can cause adverse muscle and joint tension."  See Cervical Lordosis and What Causes Loss of Cervical Lordosis, Scoliosis Reduction Center, available at https://www.scoliosisreductioncenter.com/blog/loss-of-

1  cervical-lordosis (last accessed June 22, 2022).  Plaintiff argues this is cherry-picking the

2  evidence.

3        Plaintiff highlights that while the ALJ noted she and her son mentioned her nightmares

4  and difficulty sleeping, the ALJ fails to note that these complaints are referenced repeatedly in

5  the medical records, and that despite taking melatonin, she was having difficulty sleeping.

6        Plaintiff submits that by relying only on the CE opinion regarding her performance on

7  mental examinations, the subjective physical complaints are brushed aside, and after the CE,

8  there are at least three notations of her depression exhibiting crying, mood changes, feeling

9  helpless and being referred to psychology or behavioral health.  (Br. 10.)  Plaintiff argues that

10 while the ALJ found the CE well supported, the ALJ failed to consider that the CE did not have

11 any records to review or that the medical records show continued treatment for depression, sleep

12 disruption, including medication.  (Br. 10.)  Plaintiff notes that after the May 17, 2018 CE, on

13 March 11, 2019, Plaintiff was again referred to behavioral health for poor energy, depressed

14 mood, and frequent crying.  (AR 483.)  On November 25, 2019, she was seen again at and

15 related a recurrence of depression with depressed mood, crying jags, feeling alone and helpless,

16 and decreased energy and difficulty sleeping.  (AR 467.)

17       Based on the above, Plaintiff argues under the *de minimis* screening standard at step two,

18 the ALJ's reliance on the CE in making the determination was not proper, and that the ALJ failed

19 to consider the above evidence including imaging performed after the CE, who had no records

20 and did not opine significantly on her physical symptoms, or on her language barrier.  Plaintiff

21 additionally highlights that upon review of the 2009 ALJ decision, which was adopted in 2017,

22 the conditions before the ALJ in 2009 were solely mental health problems; thus there was a

23 change in her physical conditions that were not considered in 2009.  (Br. 11.)

24       3.    The Court finds the ALJ did not Err at Step Two

25       Defendant responds that the ALJ properly relied on three prior administrative medical

26 findings and one medical opinion to find the impairments were not severe.  The Court agrees.

27       As to physical impairments, State agency medical consultant Dr. Pak reviewed the

28 available record at the initial determination, and noted the record contained evidence of

7

1  conservative treatment; essentially benign exam findings; x-rays with minimal findings; and no

2  significant physical limitations.  (AR 100.)  Dr. Pak's findings, dated May 31, 2018, found

3  Plaintiff's physical impairments were non-severe.  (Id)  On October 29, 2018, State agency

4  medical consultant Dr. Jone, reviewed the updated record at the reconsideration level, and noted

5  the additional evidence (appearing to be a colonoscopy) failed to establish that Plaintiff had any

6  severe physical impairments.  (AR 112.)

7      As for mental impairments, on October 26, 2018, State agency psychological consultant

8  Dr. Kresser reviewed the record at the reconsideration level, and noted that it contained evidence

9  of mild depression but no evidence of significant functional limitations related to the depression.

10  (AR 113.)  Dr. Kresser found that Plaintiff had mild limitations in adapting or managing herself,

11  and therefore, had a non-severe mental impairment.  (Id.)

12      Dr. Swanson conducted a consultative examination on June 26, 2018.  (AR 403-408.)

13  Dr. Swanson concluded that Plaintiff is: able to maintain concentration and relate appropriately

14  to others in a job setting; able to handle funds in her own best interest; expected to understand,

15  carry out, and remember simple instructions; able to respond appropriately to usual work

16  situations, such as attendance; can changes in routine without being excessively problematic;

17  does not appear to have substantial restrictions in daily functioning; and does not appear to have

18  difficulties in maintaining social relations.  (AR 408.)  Significantly, Dr. Swanson noted that

19  during the exam, Plaintiff "appeared motivated to perform poorly in an effort to appear

20  intellectually deficient," and stated there was no "genuine reason to suspect that her mental or

21  emotional functioning falls sincerely outside normal limits despite effort to present otherwise."

22  (AR 407.)  In relation to these statements, Dr. Swanson noted as to the WAIS-IV test, that

23  Plaintiff's test results were invalid because she appeared to intentionally perform poorly by

24  answering incorrectly to very simple, sample items; obtained an IQ score of 50, corresponding to

25  mild to moderate retardation, and "[c]learly, she [is] functioning at a considerably higher level."

26  (AR 406.)

27      As for Plaintiff's averment that Dr. Swanson did not consider Plaintiff's language

28  barriers, Dr. Swanson did note she was present with an interpreter, and noted her Laotian speech

1   was unremarkable and no speech peculiarities were observed.  (AR 405.)  As to the LIPS-R test,

2   Dr. Swanson specifically noted the test requires "neither speech nor the ability to understand

3   speech, it may be used with those having hearing impairments, severe expressive and/or

4   receptive language disabilities . . . cultural disadvantage, or unfamiliarity with English.  (AR

5   406.)  Dr. Swanson noted on this test, she obtained an I.Q. result of 46, at the 1st percentile, and

6   found the test to be invalid as Plaintiff appeared intentionally to perform poorly, and clearly

7   functions at a higher level.  (AR 407.)

8         Additionally, Dr. Swanson noted:

> Her appearance reflected excellent concern for personal hygiene and grooming.  There was noting remarkable about her physical presentation.  [She] appeared motivated to make a case for disability by exaggerating compromise in functioning in an effort to appear intellectually deficient.  She claimed only to be oriented to person and place; not time or situation.  Asked the date, she said that she did not know.  Asked her age, she said that she did not know.  Asked the name of the current U.S. President, she said that she did not know.  Her attitude during the assessment was ultimately uncooperative due to the aforementioned.  The level of eye contact that she made was within normal limits . . .
>
> . . . Nothing atypical was observed in the claimant's gait or postural presentation.  She displayed an average amount of motor movement with no marked idiosyncrasies.  Her speech (Laotian) was unremarkable; no speech peculiarities were observed.  She exhibited a constricted range of affect that varied consonantly with speech content.  Mood was euthymic.  She reported feeling "a headache" the day of the testing and indicated that she feels "sometimes back pain" most days.  Form and content of thought were within normal limits.  No evidence of delusional material was present.  A disorder of perception was not in evidence.  There was no indication of psychosis.
>
> No suicidal or homicidal ideation was elicited.  Vegetative signs of depression were mostly absent.  Short-term, recent, and remote memories were poor; this appeared intentional.  Inadequate abstraction ability was in evidence with response to proverbs, such as, "A bird in the hand is worth two in the bush;" this appeared intentional.  Concentration was inadequate for performing simple, mathematical calculations (e.g., 22+39); this appeared intentional.  Judgment and insight were deemed poor in response to queries about, for example, what action the claimant would take were she to come upon a sealed, stamped, and addressed envelope on the ground; this appeared intentional.  General fund of knowledge fell below normal limits based upon responses to questions of present world importance (e.g., Who is the President of the United States?); this appeared intentional.

(AR 404-405.)

Turning to Plaintiff's contentions regarding evidence that subsequently entered the record after the consultative examination, Defendant responds that these records totaling approximately 100 pages (AR 444-548), do not establish workplace limitations.  (Opp'n 14.)  Defendant concedes the December 2019 x-ray showed some mild abnormalities (AR 457), but contends such imaging evidence does not correlate with any workplace limitations, as regardless of what the imaging revealed, Plaintiff needed to establish that the imaging evidence was linked with evidence showing she was physically limited, and Plaintiff failed to do so.

The December 19, 2019 lumbar spine x-ray noted the following findings: "No fracture or dislocation.  Some straightening of the lumbar spine is seen with mild degenerative disease involving the body noted, as well as the facet joint at the L3-4, L4-5 and L5-S1 levels.  Surgical clips project on the right paraspinal region.  Pedicular spinous process is well respected.  (AR 457.)  The December 19, 2019 cervical spine x-ray noted the following findings: "No listhesis noted with limited motion, however, noted.  The posterior alignment is requested.  Cervical vertebrae demonstrate normal height.  The prevertebral soft tissues are normal."  (AR 459.)  The impression of the cervical x-ray noted: "Limited motion.   Mild degenerative disease. Straightening of the cervical spine."  (Id.)

The December 19, 2019 knee x-ray noted the following findings: "Scattered degenerative changes are seen.  No acute fracture or dislocation is seen.  Soft tissues demonstrate no gas or radiopaque foreign body."  (AR 461.)  Under impression, the report states: "Degenerative change.  No acute findings."  (AR 462.)

In the portion of the opinion that notes the December 19, 2019 x-rays, the ALJ made the following findings:

> The claimant has been diagnosed with osteopenia based on a DEXA scan (Ex. B-9F, p. 23).  Lumbar and cervical x-rays on March 26, 2018 showed minimal and mild chronic changes. Bilateral knee x-rays on the same date showed minimal osteoarthritis changes of the right and left knees (Ex. B-2F, p. 12-13).  The claimant walked unassisted on August 26, 2019.  Her back was straight without deformity, she could flex to touch her toes, had 15 degrees of extension and 30 degrees of bilateral lateral flexion and rotation.  She had full range of motion in the left knee

1

2

3

4

5

> with no testing indications of internal derangement, and 5/5 strength of the bilateral upper and lower extremities (Ex. B-9F, p. 24 & 26). X-rays performed on December 19, 2019 showed only mild degenerative changes of the cervical and lumbar spine (Ex. B-9F, p. 14 & 16) and scattered degenerative changes of the left knee (Ex. B-9F, p. 18). Her overall physical examination on December 23, 2019 was essentially benign and she ambulated independently without an assistive device (Ex. B-9F, p. 13).

6 (AR 20.) In discounting Plaintiff's claims of being incapable of performing chores or making

7 her own meals, the ALJ noted that she had 5/5 strength of the bilateral upper and lower

8 extremities on August 26, 2019, with full lumbar range of motion, and no reported pain

9 complaints on range of motion testing. (AR 18.)

10       Defendant argues that the following evidence demonstrates the supportability of the

11 ALJ's physical severity finding: on August 1, 2018, Plaintiff walked normally, had a supple neck

12 with full range of motion, had normal back and extremities, and had a normal neurological exam

13 (AR 490); during her March 11, 2019 annual examination, Plaintiff walked normally, had a

14 supple neck with full range of motion, exhibited normal strength in her extremities, had a normal

15 neurological examination, and stated that she was not concerned about her knee (AR 478-479)[6];

16 on June 10, 2019, one provider doubted that she had diabetes (AR 475); two days later she stated

17 that she exercised regularly (AR 512); on August 26, 2019, Plaintiff walked normally, had a

18 supple neck with full range of motion, exhibited normal strength in her extremities, had full

19 range of motion in her left knee, and had a normal back with full range of motion and no sign of

20 deformity (AR 469); on September 12, 2019, Plaintiff complained of foot pain, but she walked

21 normally with normal strength in her lower extremities (AR 509); on December 23, 2019, an

22 examination was unremarkable (AR 456); from late 2019 to February 2020, Plaintiff was treated

23 successfully for chlamydia (AR 499-506), with the most recent medical record establishing that

24 Plaintiff functioned without significant limitation; on February 10, 2020, Plaintiff presented for

25 her annual assessment, with her neck appearing normal with a normal range of motion (AR 446);

26 her cardiovascular and respiratory functions were unremarkable (AR 446); and although she had

27

28

---

[6] The Court notes that at this March 11, 2019 examination, Plaintiff was noted as still having pain in the neck, but that she had been going to physical therapy, and the record notes x-rays showed minimal degenerative changes. (AR 478.) The record does indeed state "Knee pain- not severe and not concerned at this time." (Id.)

1    some lumbar tenderness, she had good strength, normal mobility for her age, normal gait, and

2    her neurologic examination was also normal (AR 447).  (Opp'n 14-15.)

3        Defendant concedes that on November 25, 2019, Plaintiff presented tearful (AR 463),

4    however, submits "one swallow doesn't make a summer." (Opp'n 15.)  Defendant argues that on

5    balance, the record does not show Plaintiff had any mental limitations, as:  Plaintiff's depression

6    was controlled with medication (AR 346, 444, 489); in August 2018, Plaintiff was appropriately

7    dressed, made good eye contact, reported her mood as "good," had a normal affect, spoke

8    clearly, exhibited appropriate and linear thought content and process, and exhibited no evidence

9    of psychosis (AR 490); in March and August 2019, she was appropriately dressed and properly

10   oriented to person, place, and time (AR 469, 479); in September 2019, she exhibited normal

11   mood and affect, spoke normally, exhibited normal behavior, judgment, and thought content (AR

12   509); in December 2019, a few weeks after Plaintiff appeared tearful, Plaintiff exhibited

13   appropriate behavior, was cooperative, was properly oriented, spoke clearly, answered questions

14   appropriately, and maintained eye contact (AR 456); and in the most recent examination dated

15   February 10, 2020, Plaintiff was cooperative, and calm, exhibited intact insight and judgment;

16   normal judgment for everyday activities and social situations; normal mood; and an appropriate

17   affect (AR 446-447).

18       Plaintiff has submitted no reply to address the Defendant's arguments or framing of these

19   records.  Based on a review of the ALJ's opinion, and the records and medical opinions relied

20   upon and summarized therein, the Court finds the ALJ's step two determination to be reasonable,

21   supported by substantial evidence in the record, and free from remandable legal error.  This is

22   not a case where the ALJ ignored treating medical provider's opinions of a severe condition, or

23   x-rays showing severe degenerative disease.  See Beatrice K. v. Comm'r, Soc. Sec. Admin., No.

24   3:19-CV-01363-BR, 2020 WL 5409153, at *8 (D. Or. Sept. 9, 2020) ("As noted, several treating

25   medical providers found Plaintiff's degenerative joint disease of the hip to be severe and that

26   Plaintiff would require hip-replacement surgery as soon as Plaintiff lost sufficient weight for

27   such a surgery to be successful.  In addition, the record contains numerous x-rays taken

28   throughout the relevant period that reflect severe degenerative disease in Plaintiff's hips.  Thus,

the record reflects Plaintiff's hip impairment is more than minimal, and, therefore, the ALJ's determination that Plaintiff's hip impairment did not pass the '*de minimis* screening device to dispose of groundless claims' at Step Two is not supported by substantial evidence in the record.").

The Court finds the ALJ properly relied upon the opinions of non-examining State agency physicians Drs. Pak, Kresser, and Jone, as well as the consultative examination completed by Dr. Swanson, in conjunction with the prior administrative findings, the longitudinal medical records, and testimony, in finding Plaintiff's medically determinable ailments were not severe at step two. See Monroe v. Astrue, No. CV 07-8084-PJW, 2009 WL 3233515, at *1 (C.D. Cal. Sept. 30, 2009) ("Plaintiff points out that an electrodiagnostic test performed in May 2006 showed some evidence of abnormality in the radial nerve . . . [n]evertheless, none of the doctors translated that abnormal finding into a functional limitation restricting Plaintiff's use of her hands . . . because there was no evidence that Plaintiff's carpal tunnel syndrome impacted her ability to perform basic work activities, the ALJ did not err in failing to find at step two that Plaintiff's carpal tunnel syndrome was not a severe impairment.") (citing Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir.1989))[7]; Hines v. Berryhill, No. 3:16-CV-02407-BR, 2018 WL 557841, at *7 (D. Or. Jan. 25, 2018) ("The claimant bears the burden to provide medical evidence to establish at Step Two that she has a severe impairment.") (citing 20 C.F.R. § 404.1512).

---

[7] In Monroe, the court additionally considered Plaintiff's arguments concerning MRI results:

> This same analysis applies to Plaintiff's complaint about the ALJ's treatment of her back ailments. Plaintiff alleges that she has thoracic and lumbar spine impairments that the ALJ completely overlooked at step two. She notes that there are MRI findings in the record that reveal "cord indentation at two levels of the thoracic spine, multi-level degenerative disc disease throughout the lumbar and thoracic spine, and moderate bilateral facet joint hypertrophy at L3-4 and L4-5 ...." (Joint Stip. at 12.) The Agency argues that there is no evidence of functional limitations stemming from these ailments and, therefore, they were not severe.

> The Court sides with the Agency here. None of the doctors has opined that Plaintiff's back problems limit her ability to perform basic work activities. Absent such evidence, the ALJ did not err in failing to conclude at step two that Plaintiff's back condition was a severe impairment.

Monroe, 2009 WL 3233515, at *2.

**B.    Whether the ALJ Erred in Assessing Plaintiff's Subjective Complaints**

Plaintiff submits that the ALJ erred by failing to provide a clear and convincing reason to disregard Plaintiff's symptom testimony.

1.    The Clear and Convincing Standard for Weighing Credibility[8]

"An ALJ is not required to believe every allegation of disabling pain or other non-exertional impairment."  Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007) (internal punctuation and citations omitted).  Determining whether a claimant's testimony regarding subjective pain or symptoms is credible requires the ALJ to engage in a two-step analysis.  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012).  The ALJ must first determine if "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."  Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal punctuation and citations omitted).  This does not require the claimant to show that her impairment could be expected to cause the severity of the symptoms that are alleged, but only that it reasonably could have caused some degree of symptoms.  Smolen, 80 F.3d at 1282.

Second, if the first test is met and there is no evidence of malingering, the ALJ can only reject the claimant's testimony regarding the severity of her symptoms by offering "clear and convincing reasons" for the adverse credibility finding.  Carmickle v. Commissioner of Social Security, 533 F.3d 1155, 1160 (9th Cir. 2008).  The ALJ must make findings that support this conclusion and the findings must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony.  Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004).

Factors that may be considered in assessing a claimant's subjective pain and symptom testimony include the claimant's daily activities; the location, duration, intensity and frequency of the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage, effectiveness or side effects of any medication; other measures or treatment used for relief;

---

[8]  While Defendant maintains the clear and convincing standard is inconsistent with other law, Defendant acknowledges the standard is applicable in the Ninth Circuit.  (Opp'n 20-21 n.8.)

1   functional restrictions; and other relevant factors.  Lingenfelter, 504 F.3d at 1040; Thomas, 278

2   F.3d at 958.  In assessing the claimant's credibility, the ALJ may also consider "(1) ordinary

3   techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent

4   statements concerning the symptoms, and other testimony by the claimant that appears less than

5   candid; [and] (2) unexplained or inadequately explained failure to seek treatment or to follow a

6   prescribed course of treatment."  Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008)

7   (quoting Smolen, 80 F.3d at 1284).

8          2.     Plaintiff's Arguments

9          Plaintiff submits that the ALJ did not consider Plaintiff's subjective complaints of

10  lumbar, neck, and knee pain, arguing such complaints were supported by objective imaging

11  evidence, which the Court discussed above.  Thus, Plaintiff submits there was a medical basis for

12  the pain, it was not considered by the ALJ, and was not accounted for in the non-existent RFC.

13  (Br. 12.)

14         Plaintiff submits she would have at least two severe impairments, a left knee

15  impairment,[9] and depression, both based on objective medical evidence of imaging and the

16  longitudinal record.  (Br. 13.)  Plaintiff proffers the following evidence regarding the knees: x-

17  rays of plaintiff's right knee on March 26, 2018, revealed chronic reactive spur of the patella and

18  chronic irregularity of the anterior tibial tubercle with the impression of chronic changes; and x-

19  rays of her left knee on December 19, 2019 revealed scattered degenerative changes, with the

20  impression of degenerative changes; and Plaintiff has presented with with pain in left knee.

21         Plaintiff emphasizes the only reference by the ALJ to the left knee was: (1) noting the x-

22  ray showed only scattered degenerative changes of the left knee; (2) noting that her overall

23  examination on December 23, 2019, was essentially benign; and (3) noting that she ambulated

24  independently without an assistive device.  (Br. 13.)  Plaintiff submits that the ability to ambulate

25  is not dispositive of issue of severity; the record indicates a medically determinable impairment

26

27  _____

28  [9]  Plaintiff presents evidence of both the right and left knee in this section of briefing.  (Br. 13.)

of the left knee, specifically degenerative joint disease[10]; the ALJ did not address how the knee condition would affect her ability to lift, carry, and perform postural activities; the ability to ambulate without a device does not show an ability to lift/carry and postural activities; and the opinion does not address that there were chronic reactive spurs of the patella, which would cause pain.

As for depression, Plaintiff emphasizes she has been diagnosed with depression on numerous occasions through Fresno Pace for Seniors.  Plaintiff argues the assessments at Pace should hold more weight than the allegations of exaggerating by Dr. Swanson, who saw Plaintiff on a one time basis, and who had no records to review.  (Br. 13-14.)  Plaintiff emphasizes the providers at Pace had the opportunity to observe Plaintiff for a longer time; that the mental evaluation by Swanson was likely less than an hour; there was a language barrier requiring an interpreter.  Plaintiff additionally states Dr. Swanson did not state whether the written portions of testing were translated, and argues the CE did not state whether he took the lack of English proficiency into effect or how that factored into the analysis.  Plaintiff argues that "[u]nlike native speakers of English, non-native speakers lack the ability to use Idiomatic expressions and to understand their meanings adequately . . . This meaning is different from the literal meaning of the idiom's individual elements.  In other words, idioms don't mean exactly what the words say." *International Journal of English and Literature,* Vol.7(7), pp. 106-111, July 2016 DOI: 10.5897/IJEL2016.0895 Article Number: 491715A59142 ISSN 2141-2626, available at http://www.academicjournals.org/IJEL (last accessed June 22, 2022).  Therefore, Plaintiff argues that it makes perfect sense that a test that bases part of its results on whether someone can understand and explain idiomatic expression would render a poor result, and if she cannot read or write English, she may not understand the English alphabet and giving a trail marking test requires her to connect letters and numbers.[11]

Finally, Plaintiff also notes that the ALJ refers to the decision in 2009 for support as well,

[10]  The Court clarifies the ALJ did find degenerative changes of the left knee to be a medically determinable impairment, however, found the impairment to be non-severe.  (AR 17.)

[11]  Before proceeding, the Court largely rejects this argument as unsupported by the report of Dr. Swanson, as the Court discussed above, Section IV(A)(3), supra.  (AR 405.)

when apparently the same doctor (Swanson) conducted the same sort of testing to the same Plaintiff.  (Br. 14.)

### 3.    The Court finds the ALJ did not Err in the Credibility Analysis

The ALJ initially summarized Plaintiff's testimony somewhat minimally, stating: "The claimant testified that she has numbness in the arms and legs and left knee pain with walking long distances.  She estimated that she can lift a gallon of milk.  The claimant stated that she began living with her son and daughter-in-law 3-4 years before the hearing.  She testified that they do all of the household chores but that she is able to cook eggs and do light sweeping."  (AR 18.)

Defendant argues this reference to specific testimony satisfies the ALJ's burden under Lambert, as Ninth Circuit cases "do not require ALJs to perform a line-by-line exegesis of the claimant's testimony, nor do they require ALJs to draft dissertations when denying benefits." Lambert v. Saul, 980 F.3d 1266, 1277 (9th Cir. 2020).  Nonetheless, the ALJ still must do more than "offering non-specific conclusions" that the testimony is "inconsistent with her medical treatment," and the "ALJ must make specific findings about a claimant's allegations, properly supported by the record and sufficiently specific to ensure a reviewing court that she did not arbitrarily discredit a claimant's subjective testimony."  Id. (citations and internal quotation marks omitted).  The Court notes, that as discussed below, the ALJ additionally referenced further testimony regarding Plaintiff's symptoms by Plaintiff and her son, when addressing specific daily activities or comparing activities to such testimony.

First, Defendant argues that the ALJ properly found Plaintiff's statements inconsistent with the numerous clinical findings in the record.  Burch, 400 F.3d at 681 ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis").  In this regard, Defendant proffers the following supportive records as to physical ailments: Plaintiff walked without difficulty (AR 447, 479, 490, 509); had normal mobility for her age, and a normal gait (AR 447); exhibited normal strength (AR 447, 479, 509); and on August 26, 2019, Plaintiff walked normally, had a supple neck with full range of motion, exhibited normal strength in her extremities, had full range of motion in her

left knee, and had a normal back with full range of motion and no sign of deformity (AR 469). With respect to her mental impairments, Defendant proffers: Plaintiff's depression was controlled with medication (AR 346, 444, 489); the record contained numerous normal psychological examinations (AR 456, 469, 479, 490, 509); and in the most recent examination, Plaintiff was cooperative, and calm, exhibited intact insight and judgment, normal judgment for everyday activities and social situations, normal mood, and an appropriate affect (AR 447). Defendant  submits that testimony in "[c]ontradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony."  Carmickle, 533 F.3d at 1161.

Additionally, Defendant highlights there was evidence of malingering as noted by Dr. Swanson.  (AR 406-07).  As for Plaintiff's arguments concerning her poor English, Defendant counters that even if the Court were to accept Plaintiff's difficulty with English in relation to understanding the proverb, it does not explain the poor effort and exaggeration throughout the exam; does not explain how Plaintiff failed a test intended for individuals like Plaintiff who did not understand English and experience a cultural deficit; and the fact Plaintiff can posit an alternative explanation does not undermine the ALJ's finding.  Burch, 400 F.3d at 679 (where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld).  Defendant highlights that Plaintiff tested very poorly on a test that required neither the speech nor the ability to understand speech, and is generally used for individuals with a "cultural disadvantage, or unfamiliarity with English" (AR 406).  Despite this, Plaintiff tested in the 1st percentile, which correlated with milder to moderate mental retardation (AR 407), and this evidence undercuts her subjective statements.  The Court summarized these multiple observations of exaggeration by Plaintiff noted by Dr. Swanson , supra, Section IV(A)(3), and the Court specifically discussed the notations pertaining to the use of certain tests for individuals with language or cultural disadvantages.  The Court agrees with Defendant that Plaintiff's arguments are not convincing in light of the totality of the notations in Dr. Swanson's consultative exam record.

Finally, Defendant additionally submits that the ALJ reasonably relied more on the prior administrative medical findings, non-examining State agency physicians, and Dr. Swanson's

consultative examination opinion, which is consistent with the regulations.

The Court shall now reproduce a significant portion of the ALJ's opinion as it demonstrates the various aspects of testimony and the record that the ALJ addressed, including, exam findings, imaging results, daily activities, notations of Dr. Swanson's observations of exaggeration, and the weight given to the medical opinions:

> The claimant rated her back pain at a 4/10 on a pain scale, but told her treating physician on December 23, 2019 that it was managed with Ibuprofen (Ex. B-9F, p. 11). Although she alleged headaches in her Headache Questionnaire (Ex. B-6E), she did not complain of any significant headaches to her treating providers (Ex. B-9F).

> The claimant alleged significant psychological symptoms including difficulty sleeping and nightmares in her Function Report (Ex. B-5E). These were also cited in a 3rd Party Function Report completed by her son (Ex. B-4E).

> Although the claimant and her son allege that she is incapable of preparing her own meals or of doing any household chores (B-4E & B-5E), there is no medical reason for such limitations. She had 5/5 strength of the bilateral upper and lower extremities on August 26, 2019 and full lumbar range of motion, with no reported pain complaints on range of motion testing (Ex. B-9F, p. 24 & 26). She ambulated independently without an assistive device on December 23, 2019 (Ex. B-9F, p. 13). Her son stated that she was physically unable to do household chores (Ex. B-4E, p. 8) but the claimant testified that she did light sweeping. The claimant and her son stated that she could not operate a motor vehicle (Ex. B-4E & B-5E), but she told Steven Swenson, Ph.D. during a psychological consultative exam that she had a license to drive and did drive (Ex. B-6F, p. 4). In fact, she produced a driver's license at the exam (Ex. B-6F, p. 5). The claimant and her son also reported that she needed help with bathing and dressing (Ex. B-4E & B-5E), but she told Dr. Swenson that she was independent in activities of daily living. Her appearance also reflexed excellent concern for personal hygiene and grooming (Ex. B-6F, p. 4).

> Dr. Swenson stated that the claimant, "…appeared motivated to make a case for disability by exaggerating compromise in functioning in an effort to appear intellectually deficient. She claimed only to be oriented to person and place; not time or situation" (Ex. B-6F, p. 4). She claimed not to know the date, her age or the name of the current U.S. president (Ex. B-6F, p. 4- 5). In Dr. Swenson's opinion, her poor cognitive performance appeared intentional and produced invalid WAIS-IV scores (Ex. B-6F, p. 5- 6).

> The conclusion that the claimant does not have an impairment or combination of impairments that significantly limits her ability to perform basic work activities is consistent with the objective medical evidence and other evidence. The claimant was diagnosed

with a cataract on June 12, 2018 that was not considered significant and dry macular degeneration. Her only symptom at that time was dry eye, her pressure was normal (Ex. B-9F, p. 24).

The claimant had an audiogram on August 29, 2018 but did not qualify for hearing aids (Ex. B- 9F, p. 1). Her treating source stated on August 26, 2019 that she had had no changes in her hearing since that time (Ex. B-9F p. 24).

The claimant had hemorrhoids, but no complaints on August 26, 2019 (Ex. B-9F, p. 24). Blood pressure was consistently normal, measuring 104/62 on July 22, 2019 (Ex. B-9F, p. 31).

The claimant's medical records also note poor dentition with dental caries (Ex. B-9F). However, there is no evidence that this condition has required any intervention and no evidence that it significantly limits her ability to perform basic work activities.

The claimant has been diagnosed with diabetes. However, she was taken off Metformin on June 10, 2019 (Ex. B-9F, p. 11), indicating that her diabetes was well controlled. Her treating physician, Billy Redmond, M.D., stated on March 11, 2019 that she was on oral medication only, reported home glucose readings between 70-110 and was testing regularly with good compliance with medications and diet (Ex. B-9F, p. 35). Dr. Redmond stated on June 10, 2019, "After her last few visits I have doubts about her actually having DM. Her A1Cs since coming to PACE have all bee normal or Pre-DM….She reports her home glucoses are always 80-120 fasting" (Ex. B-9F, p. 32). In fact, her A1C was described as "persistently normal" on July 22, 2019 (Ex. B- 9F, p. 31) and was normal at 5.8 on August 19, 2019 (B-9F, p. 24). As she has no secondary manifestations of diabetes, there is no evidence that this impairment significantly limits her ability to perform basic work activities. It is therefore non-severe.

The claimant has been diagnosed with osteopenia based on a DEXA scan (Ex. B-9F, p. 23). Lumbar and cervical x-rays on March 26, 2018 showed minimal and mild chronic changes. Bilateral knee x-rays on the same date showed minimal osteoarthritis changes of the right and left knees (Ex. B-2F, p. 12-13). The clamant walked unassisted on August 26, 2019. Her back was straight without deformity, she could flex to touch her toes, had 15 degrees of extension and 30 degrees of bilateral lateral flexion and rotation. She had full range of motion in the left knee with no testing indications of internal derangement, and 5/5 strength of the bilateral upper and lower extremities (Ex. B-9F, p. 24 & 26). X-rays performed on December 19, 2019 showed only mild degenerative changes of the cervical and lumbar spine (Ex. B-9F, p. 14 & 16) and scattered degenerative changes of the left knee (Ex. B-9F, p. 18). Her overall physical examination on December 23, 2019 was essentially benign and she ambulated independently without an assistive device (Ex. B-9F, p. 13).

The Administrative Law Judge who rendered a previous decision in this case in 2009 found that the claimant had medically

determinable impairments of depression and PTSD. However, both were found to be non-severe.

The claimant was previously diagnosed with depression, but in an exam on August 26, 2019 stated that her Fluxoetine was working well to control this condition (Ex. B-9F, p. 24). As noted above, the claimant apparently made a deliberative effort to perform poorly on testing during a June 26, 2018 psychological consultative exam. The examiner, Steven Swenson, Ph.D., stated that she denied knowing the date or current U.S. president and that her attitude during the assessment was ultimately uncooperative (Ex. B-6F, p. 4-5). She exhibited a restricted range of affect but mood was euthymic. There were no vegetative signs of depression. Although short term, recent and remote memories were poor, this appeared intentional. Concentration was inadequate for performing simple mathematical calculation, a deficit that also appeared intentional. Poor judgment, insight and general fund of knowledge were intentional in Dr. Swenson's opinion (Ex. B-6F, p. 5).

Dr. Swenson administered the WAIS-IV, on which the claimant attained a Perceptual Reasoning Index of 50 and a Processing Speed Index of 50. He stated, "These results are invalid. (The claimant) appeared intentionally to perform poorly; even giving incorrect responses to very simple, sample items." Dr. Swenson noted that her perceptual reasoning score would place her in the mild to moderate mental retardation range but that she was clearly functioning at a higher level (Ex. B-6F, p. 6). He stated that her Full Scale IQ of 46, at the 1st percentile, was also invalid and was apparently the result of her intentional poor performance (Ex. B-6F, p. 7).

Based on his findings and clinical observations, Dr. Swenson gave the claimant no mental diagnosis other than that of rule out malingering and gave her no functional restrictions (Ex. B- 6F, p. 7). This opinion is well supported by his exam findings and the Administrative Law Judge finds it persuasive.

The non-examining DDS M.D.s who evaluated this case at the initial and reconsideration levels agreed to adopt the original 2009 Administrative Law Judge decision finding that the claimant did not have a severe physical impairment. Both medical consultants concluded that there was not enough change in the claimant's condition to alter the Administrative Law Judge decision (Ex. B-2A, p. 7 & B-6A, p. 8). This was also the conclusion of the non-examining DDS psychological consultants at the initial and reconsideration levels. They noted poor effort at Dr. Swenson's consultative exam, resting the denial of benefits on her poor cooperation (Ex. B-2A, & B-6A). These opinions are consistent with the medical evidence, and the Administrative Law Judge finds them persuasive. Therefore, the Administrative Law Judge finds that the presumption under the Chavez Acquiescence Ruling (AR 97-4(9)) that the claimant continues to be not disabled has not been rebutted by any evidence of changed circumstance affecting the issue of disability.

1   (AR 18-21.)

2       The ALJ also made findings concerning Plaintiff's reported symptoms and conflicting

3   evidence when considering the four broad functional areas for evaluating mental disorders (the

4   paragraph B criteria):

> The first functional area is understanding, remembering or
> applying information. In this area, the claimant has no limitation.
> The claimant's son stated that she needs assistance with written
> and spoken instructions and cannot drive (Ex. B-4E, p.8 & 10).
> However, the claimant told Dr. Swenson that she has a driver's
> license and drives a car (Ex. B-6F, p. 4). As discussed in detail
> above, she appeared to intentional exaggerate her intellectual
> limitations during his exam, producing invalid IQ scores.
>
> The next functional area is interacting with others. In this area, the
> claimant has no limitation. The claimant's son reported that she
> spent time with her family and visiting friends on a daily basis and
> had no difficulty in doing so. He also reported that she was able to
> attend doctor's appointments (Ex. B-4E, p. 9).
>
> The third functional area is concentrating, persisting or
> maintaining pace. In this area, the claimant has no limitation.
> Although the claimant attempted to exaggerate her limitations in
> this domain during the psychological consultative exam, the results
> of her WAIS-IV testing were invalid due to poor cooperation (Ex.
> B-6F). Her son alleges that she has difficulty paying attention (Ex.
> B-4E, p. 10), but this assertion is contradicted by Dr. Swenson's
> observations and the lack of any objective medical signs or
> findings indicating a poor ability to concentrate, persist or maintain
> pace.
>
> The fourth functional area is adapting or managing oneself. In this
> area, the claimant has mild limitation. The claimant's son stated
> that she needed reminders to attend doctor's appointments (Ex. B-
> 4E, p. 9).

21  (AR 21.)

22      The Court first turns to the issue of evidence of malingering in the record.  The ALJ

23  clearly noted and depended on Dr. Swanson's findings concerning Plaintiff's exaggeration

24  during the consultative exam.  In briefing, although discussion of the clear and convincing

25  standard is done tangentially due to the Commissioner's dispute with the standard in the Ninth

26  Circuit, Defendant does not attempt to argue that the ALJ would not be required to provide clear

27  and convincing reasons to discount the testimony given the evidence of malingering.  The Court

28  notes there is a lack of clarity on the precise question of whether there simply needs to be

evidence of malingering on the record, of if the ALJ is required to make a clear affirmative finding of evidence of malingering in the opinion.

Numerous statements from Ninth Circuit appear to use language indicating that the ALJ does not need to make an affirmative statement or finding in the opinion.  See Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989) ("The Secretary's reasons for rejecting excess symptom testimony must be clear and convincing if medical evidence establishes an objective basis for some degree of the symptom and no evidence affirmatively suggests that the claimant was malingering."); Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996) ("If the claimant produces evidence to meet the *Cotton* test and there is no evidence of malingering," then must provide clear and convincing); Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006) ("In the absence of evidence that Greger is malingering, the ALJ's reasons for rejecting his testimony 'must be clear and convincing.' ") (quoting Swenson, 876 F.2d at 687); Austin v. Saul, 818 F. App'x 725, 727 (9th Cir. 2020) ("As for Austin's own credibility, the ALJ was required to articulate specific, clear, and convincing reasons for discounting it unless the record contained affirmative evidence of malingering.").[12]

Other caselaw indicates that there must be a determination by the ALJ that the claimant is malingering.  See Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006) ("[U]nless an

---

[12]  In the unpublished opinion in Austin, the Ninth Circuit further went on to consider the argument that the record did contain affirmative evidence of malingering and absolved the ALJ of the requirement to provide clear and convincing reasons, but found the ALJ's opinion indicated the ALJ did not accept the report that contained the evidence of malingering and thus rejected the Commissioner's argument that it was not required to provide clear and convincing reasons:

> The Commissioner fleetingly argues that the record contains affirmative evidence of malingering, thereby absolving the ALJ of the obligation to articulate clear and convincing reasons for an adverse credibility finding. *See Carmickle*, 533 F.3d at 1160. For this proposition the Commissioner cites the report of Dr. Sorweide, which makes brief reference to "signs of malingering" without any accompanying explanation. But the ALJ appears to have rejected this view—she did not cite Dr. Sorweide's statement in connection with her adverse credibility determination, declined to give his report full weight, and rejected his assertion that Austin had no limitations, concluding instead that Austin had severe impairments that impose more than minimal limitations on his ability to work. We thus do not consider Dr. Sorweide's unexplained notation to constitute affirmative evidence of malingering. Nor do we equate a claimant's possible exaggerations regarding the severity of his symptoms with affirmative evidence of malingering.

Austin, 818 F. App'x at 727–28.

ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each."); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014) ("if the claimant has produced that evidence, and the ALJ has not determined that the claimant is malingering, the ALJ must provide" specific clear and convincing reasons).

In the unpublished opinion in Schow, the dissent contended that the statement like that enunciated in Robbins is against the weight of Ninth Circuit law only requiring the existence of affirmative evidence suggesting malingering:

> In *Robbins v. Social Security Administration,* 466 F.3d 880 (9th Cir.2006), we appeared to hold that the clear and convincing standard is required when an ALJ fails to conclude that a claimant is malingering. However, as the majority's disposition acknowledges, we cited *Smolen* for that proposition, which requires only the existence of "affirmative evidence suggesting" that a claimant is malingering. *Smolen,* 80 F.3d at 1283–84. Our other cases addressing the clear and convincing standard more clearly adopt the *Smolen* test. *See, e.g., Lingenfelter v. Astrue,* 504 F.3d 1028 (9th Cir.2007) ("[If] there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.' ") (quoting *Smolen,* 80 F.3d at 1281 and citing *Robbins,* 466 F.3d at 883); *Greger v. Barnhart,* 464 F.3d 968, 972 (9th Cir.2006); *Dodrill v. Shalala,* 12 F.3d 915 (9th Cir.1993) ("If there is medical evidence establishing an objective basis for some degree of pain and related symptoms, and no evidence affirmatively suggesting that claimant was malingering, the Secretary's reason for rejecting a claimant's testimony must be clear and convincing.") (internal quotation marks omitted).
>
> Moreover, our precedent does not require an *express* finding of malingering. Indeed, *Smolen* noted both that the ALJ "made no finding" that the claimant was malingering *and* that none "of the evidence suggest she was doing so." *Smolen,* 80 F.3d at 1284 n. 6. The latter statement, of course, would be superfluous if only an express finding of malingering was required. Here, the ALJ certainly implied that Schow was malingering. After indicating that on March 21, 2000, Schow "requested a note asking that he not have to work so many hours" due to his back pain while incarcerated, "[c]linical findings were inconsistent and [Schow] exhibited non-reproducible physical findings, interesting posturing that is not consistent with his known pathology ... [Schow] stated that he could not move his arm or neck but when asked to do so during the examination he was able to. His history was noted to be inconsistent about where it hurt and what made it hurt." The purpose of noting these observations clearly was to imply that Schow had lied about or exaggerated his back pain to avoid prison

1    work-that is, to point out that Schow had malingered.

2    Schow v. Astrue, 272 F. App'x 647, 654 (9th Cir. 2008) (O'Scannlain, J., dissenting in part,

3    concurring in judgment).  The majority actually agreed that the dissent was correct as to the state

4    of the caselaw, but disagreed with the application to the facts of the case, similar to Austin, 818

5    F. App'x at 727–28, supra:

> The dissent argues that our holding from *Robbins,* which requires
> that an ALJ provide clear and convincing reasons for an adverse
> credibility finding unless he makes a "finding of malingering based
> on affirmative evidence thereof," 466 F.3d at 883, is anomalous in
> that the weight of our cases hold that the mere existence of
> "affirmative evidence suggesting" malingering vitiates the clear
> and convincing standard of review. Although the dissent is correct
> in its assessment of our case law, we find that the record does not
> contain "affirmative evidence suggesting" that Schow was
> malingering, and, therefore, the ALJ was still required to support
> his credibility finding with clear and convincing reasons. The
> dissent points to "affirmative evidence" consisting of "[t]hree
> separate medical tests between March 2000 and April 2001" that
> showed "unremarkable" or normal results, and a fourth
> examination conducted by nurse practitioner Ramirez–Williams on
> March 21, 2000. Dissent at 654. Any reliance on Ramirez–
> Williams's findings is immediately suspect because the ALJ found
> that he was not an "acceptable" medical source and gave his
> opinions "little weight." It would be inconsistent to both credit
> Ramirez–Williams's intimation that Schow was a malingerer and
> reject Nguyen's express opinion that Schow was not a malingerer
> when the ALJ rejected both of these nurses' opinions for the same
> reasons. Likewise, the April 11, 2001 medical visit does not
> provide reliable support for the dissent's position because that visit
> was with nurse Nguyen, whose opinion was properly rejected by
> the ALJ and who expressly opined that Schow was not a
> malingerer. Further, despite the fact that x-rays taken during a
> March 3, 2000 visit with Dr. Berselli were "unremarkable," Dr.
> Berselli did find Schow's symptoms legitimate enough to order an
> MRI because Schow "may well have a cervical disc herniation."
> The final piece of affirmative evidence would seemingly come
> from a December 15, 2000 neurosurgical consultation, which
> lasted 15 minutes, indicating good range of motion of the neck and
> resulting in an MRI finding of a mild bone spur "but nothing really
> remarkable causing spinal cord compression or nerve root
> compression." The findings from this brief examination are mixed
> at best and, by themselves, do not constitute affirmative evidence
> of malingering.

26   Schow, 272 F. App'x at 651–52.

27   District courts have cited to this finding in Schow pertaining to the state of the caselaw.

28   Although stating the ALJ *did* find evidence of malingering, the court in John R. stated,

1    "[a]ffirmative evidence of malingering—standing alone—can support an ALJ's rejection of the

2    plaintiff's testimony." John R. v. Comm'r of Soc. Sec., No. C19-5745 BHS, 2020 WL 1819869,

3    at *3 (W.D. Wash. Apr. 10, 2020) ("The existence of 'affirmative evidence suggesting

4    malingering vitiates the clear and convincing standard of review' ") (quoting Schow, 272 F.

5    App'x at 651).  Citing John R. and Schow, the court in Sweets discussed the lack of clarity in the

6    state of law in this arena, and following guidance from other courts in the Southern District of

7    California, applied the clear and convincing standard, where, while there was evidence of

8    malingering that was noted by the ALJ, there wasn't a clear finding of "malingering" or use of

9    the express term:

> The next prong, whether there is evidence of malingering, is less
> clear. Defendant contends that "there was evidence of malingering
> or symptom magnification in the record" and as such, the "clear
> and convincing standard should not apply." Def.'s Mot. at 13.
> Plaintiff does not address the malingering contention. Pl.'s
> Mot.; see also Reply. "It is still an open question in the Ninth
> Circuit whether the ALJ must make a specific finding of
> malingering or whether a lesser standard of 'mere evidence of
> malingering' in the record is sufficient to avert application of the
> clear and convincing standard." Escobar v. Colvin, 2016 WL
> 354416, at *12 n.2. (S.D. Cal., Jan. 4, 2016) (citing Ghanim v.
> Colvin, 763 F.3d 1154, 1163 n.9, 207 Soc. Sec. Rep. Serv. 404,
> Unempl. Ins. Rep. (CCH) P 15285C (9th Cir. 2014)). Here, while
> the ALJ recognized Dr. Sabourin's observation that Plaintiff's
> weakness was feigned, he did not make a specific finding
> regarding Plaintiff's alleged malingering. AR at 15-31.
> Accordingly, the Court will "will err on the side of caution and
> apply the clear and convincing standard to the ALJ's credibility
> determination." Escobar, 2016 WL 354416, at *18 n.2 ("err[ing]
> on the side of caution and apply[ing] the clear and convincing
> standard to the ALJ's credibility determination where there was
> evidence of malingering in the record but the ALJ did not make a
> specific finding.); see also Williams v. Berryhill, 2018 WL
> 3007963, at *4 (S.D. Cal., June 15, 2018) (noting that the ALJ did
> not use the word malingering and stating that "the Court will
> assume without deciding that "symptom exaggeration" is not
> equivalent to "malingering.").

24    Sweets v. Comm'r of Soc. Sec., No. 19CV1816-BLM, 2020 WL 5759756, at *14 (S.D. Cal.

25    Sept. 25, 2020), aff'd sub nom. Sweets v. Kijakazi, 855 F. App'x 325 (9th Cir. 2021).

26        The Court largely finds that the language in the primary caselaw from the Ninth Circuit

27    establishing the clear and convincing standard did not enunciate a requirement for the ALJ to

28    make a finding that there is affirmative evidence of malingering in the record.  See Swenson, 876

1   F.2d at 687; Smolen, 80 F.3d at 1281; Greger, 464 F.3d at 972; Austin, 818 F. App'x at 727;

2   Schow, 272 F. App'x at 651–52, 654.   Nonetheless, like in Sweets, the ALJ here, clearly did

3   recognize Dr. Swanson's observations of feigning and exaggeration during testing, however, did

4   not make a specific finding that Plaintiff was malingering, or that there was affirmative evidence

5   of malingering.   Rather, the ALJ utilized that aspect of the CE to weigh the opinion, and to find it

6   provided strong support for finding Plaintiff's alleged limitations to be non-severe in relation to

7   the evidence as a whole.   Therefore, because the parties proceed under the presumption that the

8   evidence of malingering did not alleviate the requirement to provide clear and convincing

9   standards, and because the ALJ's reasoning is free from error under either standard, the Court, in

10  an abundance of caution, proceeds to determine whether the ALJ provided clear and convincing

11  reasons to reject Plaintiff's testimony.

12       Even if the ALJ did not depend on a finding of affirmative evidence of malingering

13  solely to make their credibility determination, the Court finds the ALJ's reliance on Dr.

14  Swanson's opinion, and the ALJ's multiple citations to Dr. Swanson's findings of exaggeration

15  and invalid test results, to be a clear and convincing reason supported by substantial evidence to

16  reject Plaintiff's testimony.   The ALJ relied on inconsistent statements made by the Plaintiff to

17  Dr. Swanson concerning her ability to drive, and ability to bathe and dress, as part of the basis

18  for rejecting Plaintiff's testimony.   (AR 19.)   The ALJ repeatedly referred to Dr. Swenson's

19  finding of intentional exaggeration and invalid scores.   (AR 19, 20, 21.)   The Court finds these

20  were clear and convincing reasons supported by substantial evidence in the record to reject

21  Plaintiff's specific testimony.   See Tommasetti, 533 F.3d at 1039 (In assessing the claimant's

22  credibility, the ALJ may consider "(1) ordinary techniques of credibility evaluation, such as the

23  claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other

24  testimony by the claimant that appears less than candid.") (quoting Smolen, 80 F.3d at 1284).

25       As excerpted above, the ALJ made multiple findings that certain of Plaintiff's ailments

26  that she testified concerning were controlled by medication.   The ALJ stated: "The claimant

27  rated her back pain at a 4/10 on a pain scale, but told her treating physician on December 23,

28  2019 that it was managed with Ibuprofen."   (AR 18.)   The ALJ stated "claimant was previously

diagnosed with depression, but in an exam on August 26, 2019 stated that her Fluxoetine was working well to control this condition [and] [a]s noted above, the claimant apparently made a deliberative effort to perform poorly on testing during a June 26, 2018 psychological consultative exam." (AR 20.)  The ALJ also noted that as for diabetes, "she was taken off Metformin on June 10, 2019 . . . indicating that her diabetes was well controlled . . .  treating physician . . .  stated on March 11, 2019 that she was on oral medication only, reported home glucose readings between 70-110 and was testing regularly with good compliance with medications and diet [and] Dr. Redmond stated on June 10, 2019, 'After her last few visits I have doubts about her actually having DM.' " (AR 19.)  The Court concludes these findings were clear and convincing reasons supported by substantial evidence in the record to discount the Plaintiff's testimony as to these conditions, in light of the totality of the record.  See Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits."); Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007) ("[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity.") (quoting Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir.1995)).

As the Court finds in the following section, the ALJ properly weighed the medical opinions in the record.  The ALJ explained why the limitations were not supported, and why the medical opinions were supported and consistent with the evidence of record.  The Court finds the ALJ's discussion of the medical opinions, and other medical evidence of record, provides a clear and convincing reason supported by substantial evidence in the record for the ALJ to discount the symptom testimony.  See Carmickle, 533 F.3d at 1161 ("Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony.") (citing Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir.1995)); Hamm v. Saul, 804 F. App'x 810, 811–12 (9th Cir. 2020) ("Hamm's testimony was inconsistent with, and unsupported by, the medical evidence of record") (citing Carmickle, 533 F.3d at 1161; Burch, 400 F.3d at 681); Streeter v. Berryhill, No. 1:17-CV-01450-JDP,  2019  WL  1060041,  at  *5  (E.D.  Cal.  Mar.  6,  2019)  ("the extensive medical evidence summarized above provides clear and convincing reasons supported

by substantial evidence for the ALJ's credibility determination . . . [and] further considered and gave weight to the medical opinions") (citing Carmickle, 533 F.3d at 1161), aff'd sub nom. Streeter v. Saul, 835 F. App'x 305 (9th Cir. 2021); Jonathan D. v. Comm'r Soc. Sec. Admin., No. 3:20-CV-01270-MK, 2021 WL 4956854, at *3 (D. Or. July 26, 2021) ("An ALJ may discount a claimants statements if medical opinion evidence contradicts the claimant's subjective testimony") (citing Carmickle, 533 F.3d at 1161), report and recommendation adopted, No. 3:20-CV-01270-MK, 2021 WL 4955899 (D. Or. Oct. 22, 2021).[13]

Accordingly, the Court finds the ALJ provided multiple clear and convincing reasons specifically tied to Plaintiff's testimony, supported by substantial evidence in the record, for discounting Plaintiff's testimony. The Court finds no error.

**C.     The ALJ's Evaluation of Treating Physicians and the Consultative Examiner**

Plaintiff submits the ALJ erred by failing to evaluate and weigh the opinions of Plaintiff's treating physicians and only considering the opinion of the consultative examiner.

1.     Plaintiff's Arguments

Plaintiff argues the medical record does not support the CE Dr. Swanson's opinion because Plaintiff presented as reporting crying spells, decreased energy, difficulty sleeping, and feeling depressed; that there were records that Dr. Swanson did not have before him to review; there was treatment for depression that occurred after Dr. Swanson's examination; and the ALJ did not consider such evidence in determining "Dr. Swanson's opinion was the be-all end-all in this case." (Br. 15.) Additionally, Plaintiff emphasizes the mental evaluation by Dr. Swanson was "likely less than an hour in duration," in addition to there being a language barrier requiring

---

[13]  The Court recognizes that a *lack* of objective medical evidence to support a claim cannot form the sole basis presented by the ALJ for rejecting pain testimony, however, even a lack of medical evidence can be a proper factor for the ALJ to consider in weighing a claimant's testimony.  See Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) ("The fact that a claimant's testimony is not fully corroborated by the objective medical findings, in and of itself, is not a clear and convincing reason for rejecting it."); Burch, 400 F.3d at 680-81 ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis . . . Contrary to Burch's argument, the ALJ did not solely rely on the minimal objective evidence and Burch's daily activities in discrediting her testimony.  Indeed, these factors were among those he relied on, however, the ALJ made additional specific findings to support his credibility determination.").  While a *lack* of objective medical evidence may not be the sole basis for rejection of symptom testimony, inconsistency with the medical evidence or medical opinions can be sufficient.  See Carmickle, 533 F.3d at 1161; Streeter, 2019 WL 1060041, at *5.

1    an interpreter, and that Dr. Swanson did not state whether the written portions of the testing were

2    translated or whether the interpreter translated them.  (Br. 15-16.)[14]  Plaintiff additionally notes

3    an x-ray from December 20, 2020, in this section of briefing.[15]

4           Plaintiff cites to various caselaw concerning the weight required to be given to a treating

5    physician, the clear and convincing and specific and legitimate standards, and emphasizes that

6    the Ninth Circuit has generally recognized treating physicians are better able to evaluate a

7    claimant's impairments over non-treating physicians.  (Br. 15-17.)  See, e.g., Smolen, 80 F.3d at

8    1285 ("Because treating physicians are employed to cure and thus have a greater opportunity to

9    know and observe the patient as an individual, their opinions are given greater weight than the

10   opinions  of other physicians.").  Nonetheless, Plaintiff acknowledges that the agency has now

11   changed its regulations pertaining to the evaluation of medical opinions for claims filed on or

12   after March 27, 2017.  (Br. 17.)  Plaintiff maintains that under the new standards, Dr. Swanson's

13   opinion is not consistent with her treatment records, and the agency still continues to recognize

14   that a treating medical source is in a unique position to observe and evaluate a claimant's

15   impairments, as the regulations identify a treatment relationship (including the length, frequency,

16   and purpose of treatment) as a factor supporting the persuasiveness of a medical source's

17   opinion.  See 20 C.F.R. §§ 404.1520c(c)(3), 416.920c(c)(3); Revisions to Rules Regarding the

18   Evaluation of Medical Evidence, 82 FR 5844-01, 2017 WL 168819, *5844 (Jan. 18, 2017) ("we

19   continue to consider a medical source's longstanding treatment relationship with the

20   individual").[16]

21          Plaintiff highlights that the ALJ has not been relieved of their duty to explain their

22   ─────────────────────────

[14]  The Court incorporates the previous discussions regarding these arguments from the two previous subsections.

[15]  Here, Plaintiff avers to a December 20, 2020 x-ray that showed "some straightening of the lumber spine mild degenerative disease involving the body noted, as well as the facet joint at the L3-4, L4-5 and L5-SI levels," and straightening of the spine, citing to AR 522-525.  The Court does not find any x-ray with this date at this section of the administrative record.  It appears Plaintiff is mistakenly referring to the December 19, 2019 x-rays, that the Court has already summarized and discussed above.  (AR 457.)

[16]  The full excerpt of this provision states that: "We revised the factors for considering medical opinions and prior administrative medical findings in final 404.1520c and 416.920c to both emphasize that there is not an inherent persuasiveness to evidence from MCs, PCs, or CE sources over an individual's own medical source(s), and vice versa, and to highlight that we continue to consider a medical source's longstanding treatment relationship with the individual."  82 FR 5844-01, 2017 WL 168819, *5844

1  rationale for rejecting or departing from a medical source's opinion, and some courts have stated

2  in the absence of further Ninth Circuit law on the regulations, it is not clear whether the previous

3  standards have been superseded.  See Kathleen G. v. Comm'r of Soc. Sec., No. C20-461 RSM,

4  2020 WL 6581012, at *3 (W.D. Wash. Nov. 10, 2020) ("The new regulations also do not clearly

5  supersede the "specific and legitimate" standard.  That standard is not an articulation of how

6  ALJs must weigh or evaluate opinions, but rather a standard by which the court evaluates

7  whether the ALJ has reasonably articulated his or her consideration of the evidence.  Whatever

8  factors the Commissioner considers in evaluating a medical opinion, he must explain his

9  reasoning to allow for meaningful judicial review, and the Ninth Circuit's 'specific and

10 legitimate' standard is merely a benchmark against which the Court evaluates that reasoning.").

11      Plaintiff submits that even assuming the mental examination contradicted Plaintiff's

12 symptoms, such contradiction was a legally inadequate reason, standing alone, to discount

13 Plaintiff's statements, as the Ninth Circuit has held that an ALJ may not reject a plaintiff's

14 symptom allegations based solely on inconsistencies between the allegations and the objective

15 medical findings in the record.  Burch, 400 F.3d at, 680 (9th Cir. 2005) ("an ALJ may not reject

16 a plaintiff's subjective complaints based solely on a lack of medical evidence to fully corroborate

17 the alleged severity of pain.").  Plaintiff submits that there is objective evidence here to support

18 the subjective complaints, and thus the ALJ erred by relying solely on the CE findings as a basis

19 for discoing Plaintiff's allegations.  (Br. 19.)[17]

20      The Court first turns to discuss the legal standards applicable to Plaintiff's claims under

21 the new regulations.

22          2.      The 2017 Regulatory Framework for Weighing Medical Opinions

23      The Social Security Administration revised its regulations regarding the consideration of

24 medical evidence — applying those revisions to all claims filed after March 27, 2017.  See 82

25 FR 5844-01.  Plaintiff filed her claim on April 17, 2018 (AR 210); therefore, the revised

26

27 [17]  The Plaintiff's concluding statement in this section of  briefing is somewhat confusing to the Court, as it is
unclear here whether Plaintiff's argument runs over into the credibility analysis mistakenly, or if the Plaintiff is
incorporating the credibility standards in relation to weighing the opinion of Dr. Swanson, although it appears to be

28 a mistaken conclusion not applicable to the challenges specific to the section of briefing.  (Br. 19.)

regulations apply.  See 20 C.F.R. § 404.1520c.

Under the updated regulations, the agency "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's own] medical sources."   20 C.F.R. §§ 404.1520c(a), 416.920c(a).[18]  Thus, the new regulations require an ALJ to apply the same factors to all medical sources when considering medical opinions, and no longer mandate particularized procedures that the ALJ must follow in considering opinions from treating sources.  See 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

"When a medical source provides one or more medical opinions or prior administrative medical findings, [the ALJ] will consider those medical opinions or prior administrative medical findings from that medical source together using" the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that "tend to support or contradict a medical opinion or prior administrative medical finding."  20 C.F.R. §§ 404.1520c(a)-(c)(1)-(5), 416.920c(a)-(c)(1)-(5).   The most important factors to be applied in evaluating the persuasiveness of medical opinions and prior administrative medical findings are supportability and consistency.  20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).  Regarding the supportability factor, the regulation provides that the "more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."   20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).  Regarding the consistency factor, the "more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

Accordingly, the ALJ must explain in the decision how persuasive they find a medical

---

[18]  The regulations at 20 C.F.R. § 404.1501 et seq., reference the regulations which apply to disability insurance benefits, and the regulations at 20 C.F.R. § 416.901 et seq. apply to supplemental security income, though the regulations are generally the same for both types of benefits.

1   opinion and/or a prior administrative medical finding based on these two factors.  20 C.F.R. §§

2   404.1520c(b)(2), 416.920c(b)(2).  Additionally, the ALJ "may, but [is] not required to, explain

3   how [they] considered the [other remaining factors]," except when deciding among differing yet

4   equally persuasive opinions or findings on the same issue.  20 C.F.R. §§ 404.1520c(b)(2)-(3),

5   416.920c(b)(2)-(3).  Further, the ALJ is "not required to articulate how [he] considered evidence

6   from nonmedical sources."  20 C.F.R. § 404.1520c(d).

7        The "treating source rule" allowed an ALJ to reject a treating or examining physician's

8   uncontradicted medical opinion only for "clear and convincing reasons," and allowed a

9   contradicted opinion to be rejected only for "specific and legitimate reasons" supported by

10  substantial evidence in the record.  See, e.g., Trevizo v. Berryhill, 871 F.3d 664, 675 (9th Cir.

11  2017).  The revised regulations no longer use the term "treating source," but instead use the

12  phrase "your medical source(s)" to refer to whichever medical sources a claimant chooses to use.

13  See 20 C.F.R. §§ 404.1520c, 416.920c; 82 FR 5844-01, 2017 WL 168819, at *5852–53

14  (eliminating "treating source rule").  In sum, the requirement that an ALJ provide "clear and

15  convincing" or "specific and legitimate" reasons for discounting a treating or examining opinion

16  no longer applies, as this "measure of deference to a treating physician is no longer applicable

17  under the 2017 revised regulations."  Jean T. v. Saul, No. 20CV1090-RBB, 2021 WL 2156179,

18  at *5 (S.D. Cal. May 27, 2021); see also, e.g., Jones v. Saul, No. 2:19-CV-01273 AC, 2021 WL

19  620475, at *7-10 (E.D. Cal. Feb. 17, 2021) (finding the new regulations valid and entitled to

20  Chevron deference, and because prior case law "is inconsistent with the new regulation, the court

21  concludes that the 2017 regulations effectively displace or override" it); Meza v. Kijakazi, No.

22  1:20-CV-01216-GSA, 2021 WL 6000026, at *6 (E.D. Cal. Dec. 20, 2021) ("courts in this circuit

23  have rejected the notion that the treating physician rule still pertains to claims filed after March

24  27, 2017").

25       Nonetheless, the new regulations still require the ALJ to explain his reasoning and to

26  specifically address how he considered the supportability and consistency of the opinion.  20

27  C.F.R. §§ 404.1520c, 416.920c; see P.H. v. Saul, No. 19-cv-04800-VKD, 2021 WL 965330, at

28  *3 (N.D. Cal. Mar. 15, 2021) ("Although the regulations eliminate the 'physician hierarchy,'

1    deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ

2    must still 'articulate how [he] considered the medical opinions' and 'how persuasive [he] find[s]

3    all of the medical opinions.") (citation omitted).  As always, the ALJ's reasoning must be free of

4    legal error and supported by substantial evidence.  Indeed, the Court notes that, for example,

5    where an ALJ's rationale for rejecting a contradicted treating physician's opinion satisfies the

6    new regulatory standard, it would almost certainly pass scrutiny under the old standard as well.

7    See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (noting that inconsistency with

8    independent clinical findings in the record is a specific and legitimate reason to reject a

9    contradicted opinion of a treating physician).  Thus, even under the new regulatory framework,

10   the Court still must determine whether the ALJ adequately explained how he considered the

11   supportability and consistency factors relative to medical opinions and whether the reasons were

12   free from legal error and supported by substantial evidence.  See Martinez V. v. Saul, No. CV

13   20-5675-KS, 2021 WL 1947238, at *3 (C.D. Cal. May 14, 2021).

14       Accordingly, the Court proceeds to address the ALJ's evaluation of any differing medical

15   opinions under the 2017 regulations.

16       3.    The Court finds the ALJ did not Err in Weighing the Medical Opinions

17       The parties recognize that when evaluating the persuasiveness of medical opinions under

18   the new regulations, the most important factors are supportability and consistency.

19       Defendant argues that the ALJ reviewed the medical opinions and found prior

20   administrative findings from the medical and psychological consultants to be the most

21   persuasive, and substantial evidence supports the decision.  In the previous sections, the Court

22   excerpted and discussed much of the ALJ's weighing and reliance on the opinions of State

23   agency physicians Drs. Pak, Jone, Kresser, and the consultative examination of Dr. Swanson.

24   Defendant argues the ALJ found these opinions persuasive because they were well supported and

25   consistent with the evidence in the record.  (AR 20-21.)  The Court agrees.

26       To briefly restate, Dr. Pak supported their finding by noting the record contained

27   evidence of conservative treatment, essentially benign examination findings, x-rays with minimal

28   findings, and no significant physical limitations (AR 100); Dr. Jone reviewed the updated record,

1   and noted the additional evidence failed to stablish that Plaintiff had any severe physical

2   impairments (AR 112); and Dr. Kresser reviewed the record noting it contained evidence of mild

3   depression but no evidence of significant functional limitations related to the depression (AR

4   113).  Dr. Swanson's opinion was supported by his examination notes, which documented

5   unremarkable findings, and evidence of exaggeration and feigning.  (AR 404-05.)

6       The Court finds the opinions are consistent with the evidence in the record, which the

7   Court largely discussed above pertaining to Plaintiff's normal physical examinations and

8   physical activities, (AR 444, 446-47, 456, 475, 469, 478-79, 490, 499-506, 509, 512), as well as

9   records pertaining to her mental limitations (AR 346, 444, 446-47, 456, 463, 469, 479, 489-90,

10  509), which the ALJ relied upon when weighing the opinions, the testimony, and the medical

11  records as a whole in their decision (AR 18-21).  Accordingly, the Court concludes the findings

12  and opinions were adequately supported.  20 C.F.R. § 416.920c(c)(1) ("The more relevant the

13  objective medical evidence and supporting explanations presented by a medical source are to

14  support his or her medical opinion(s) or prior administrative medical finding(s), the more

15  persuasive the medical opinions or prior administrative medical finding(s) will be.").  The Court

16  additionally finds the totality of the longitudinal record is consistent with the prior administrative

17  medical findings and with Dr. Swanson's medical opinion 20 C.F.R. § 416.920c(c)(2) ("The

18  more consistent a medical opinion(s) or prior administrative medical finding(s) is with the

19  evidence from other medical sources and nonmedical sources in the claim, the more persuasive

20  the medical opinion(s) or prior administrative medical finding(s) will be.").  Accordingly, the

21  Court concludes the ALJ properly relied on the opinions of Drs. Pak, Jone, and Kresser.  See 20

22  C.F.R. § 416.913a(b)(1) ("Administrative law judges are not required to adopt any prior

23  administrative medical findings, but they must consider this evidence according to §§ 416.920b,

24  416.920c, and 416.927, as appropriate, because our Federal or State agency medical or

25  psychological consultants are highly qualified and experts in Social Security disability

26  evaluation."); Chaudhry v. Astrue, 688 F.3d 661, 671 (9th Cir. 2012) (ALJ properly relied more

27  on non-examining physician's opinion than examining physician's opinions to assess the

28  claimant's RFC); Thomas, 278 F.3d at 957 ("The opinions of non-treating or non-examining

1  physicians may also serve as substantial evidence when the opinions are consistent with

2  independent clinical findings or other evidence in the record.").

3      Further, the fact that time elapsed and subsequent evidence entered the record does not

4  preclude an ALJ from relying on the prior administrative medical findings.  See Meadows v.

5  Saul, 807 F. App'x 643, 647 (9th Cir. 2020) ("[A]lthough the non-examining state agency

6  physicians did not review any evidence beyond August 2014, the ALJ did not err in giving great

7  weight to the physicians' opinions.  There is always some time lapse between a consultant's

8  report and the ALJ hearing and decision, and the Social Security regulations impose no limit on

9  such a gap in time.  At the time they issued their opinions, the non-examining experts had

10 considered all the evidence before them, satisfying the requirements set forth in 20 C.F.R. §

11 404.1527(c)(3)."); Owen v. Saul, 808 F. App'x 421, 423 (9th Cir. 2020) (same); Jennings v.

12 Saul, 804 F. App'x 458, 462 (9th Cir. 2020) (same); Garner v. Saul, 805 F. App'x 455, 458 (9th

13 Cir. 2020) ("To be sure, such a substantial delay would undoubtedly be significant if, in the

14 interim, the ALJ received additional medical evidence that in her opinion may change the

15 expert's finding . . .  [h]owever, Garner gives no explanation as to why the gap in time is

16 significant and points to no subsequently obtained evidence that contradicts the experts'

17 opinions."); Meyer v. Comm'r of Soc. Sec. Admin., No. CV-20-00802-PHX-DJH, 2021 WL

18 2801775, at *5 (D. Ariz. July 6, 2021) ("To begin, it is not legal error to give greater weight to

19 the opinion of a physician who did not review the entire record.").

20     In the previous sections, the Court discussed the x-rays and record of presenting tearful,

21 that entered the record after the physicians reviewed the record.  The Court finds the evidence

22 that subsequently entered the record was consistent with the longitudinal record reviewed by the

23 physicians, and consistent with the physician's opinions.  See Zialcita v. Comm'r of Soc. Sec.,

24 No. 1:20-CV-00053-SAB, 2021 WL 63347, at *11, 14 (E.D. Cal. Jan. 7, 2021) ("Because the

25 evidence that subsequently entered the record was consistent with the opinions of Dr. Fast and

26 Dr. Linder, the ALJ properly relied on their opinions and substantial evidence supports the

27 residual functional capacity assessment.") (citing Tonapetyan v. Halter, 242 F.3d 1144, 1149

28 (9th Cir. 2001)); Trevino v. Comm'r of Soc. Sec., No. 1:19-CV-01632-EPG, 2021 WL 620700,

at *1 (E.D. Cal. Feb. 17, 2021) ("The ALJ did not have a duty to further develop the record solely because the record contained medical records post-dating the non-examining State agency physicians' review"); Lamas v. Saul, No. 1:19-CV-00852-BAM, 2020 WL 6561306, at *10 (E.D. Cal. Nov. 9, 2020) ("The mere existence of medical records post-dating a State agency physician's review does not in and of itself trigger a duty to further develop the record."), Digiacomo v. Saul, No. 1:19-CV-00494-BAM, 2020 WL 6318207, at *8 (E.D. Cal. Oct. 28, 2020) ("Here, the ALJ did not substitute her judgment for a competent medical opinion, play doctor, or make independent medical findings as Plaintiff contends . . . The ALJ merely found that the state agency physicians' opinions were consistent with the subsequent medical records as part of her duty to consider and weigh the relevant evidence in developing the RFC."); Smith v. Saul, No. 1:19-CV-01085-SKO, 2020 WL 6305830, at *10 (E.D. Cal. Oct. 28, 2020) (rejecting plaintiff's duty to develop argument because plaintiff failed "to explain how any of the relatively unremarkable evidence post-dating the State agency physicians' opinions, described above, would materially affect the ALJ's disability determination.").[19]

Finally and significantly, the Defendant highlights that "[s]trangely, Plaintiff does not actually identify a treating opinion ignored by the ALJ despite the regurgitation of boiler plate regarding ignoring a treating opinion.  The record does not contain any.  Accordingly, this Court should reject Plaintiff's undeveloped argument."  (Opp'n 19-20.)  Plaintiff does not reply to this contention.  Plaintiff does passingly aver in the opening brief's summary of evidence that "the ALJ considered the records of Plaintiff's treating physician AR 19" (Br. 3); refers to a treating doctor from the previous decision in 2009 (Br. 8); states that "[a]s for the allegation of non-severe depression, plaintiff has been diagnosed with major depression disorder on numerous occasions through Fresno Pace for Seniors . . . assessments at Pace should hold more weight than the allegations of exaggerating by CE Steven Sw[a]nson who saw the plaintiff on a one time basis and who had no records to review," and "treating providers at Pace have had the opportunity to treat and observe plaintiff on a long-term basis."  (Br. 13-14.)  However, the

---

[19] Plaintiff did not specifically raise a challenge that the ALJ had a duty to develop the record.

1    Defendant is correct that Plaintiff has directed the Court to no specific medical opinion or record

2    from a treating or examining physician that contains functional limitations that the Plaintiff has

3    argued the ALJ was required to give greater weight to.

4            The Court notes that the ALJ did make findings as to certain records pertaining to

5    specific ailments, from physicians referred to by the ALJ as treating, in finding those ailments

6    not severe.  For example, when finding Plaintiff's diabetes was not severe, the ALJ relied in part

7    on the treating physician's findings:

8                    The claimant has been diagnosed with diabetes. However, she was
                     taken off Metformin on June 10, 2019 (Ex. B-9F, p. 11), indicating
9                    that her diabetes was well controlled. Her treating physician, Billy
                     Redmond, M.D., stated on March 11, 2019 that she was on oral
10                   medication only, reported home glucose readings between 70-110
                     and was testing regularly with good compliance with medications
11                   and diet (Ex. B-9F, p. 35). Dr. Redmond stated on June 10, 2019,
                     "After her last few visits I have doubts about her actually having
12                   DM. Her A1Cs since coming to PACE have all bee normal or Pre-
                     DM….She reports her home glucoses are always 80-120 fasting"
13                   (Ex. B-9F, p. 32). In fact, her A1C was described as "persistently
                     normal" on July 22, 2019 (Ex. B- 9F, p. 31) and was normal at 5.8
14                   on August 19, 2019 (B-9F, p. 24). As she has no secondary
                     manifestations of diabetes, there is no evidence that this
15                   impairment significantly limits her ability to perform basic work
                     activities. It is therefore non-severe.
16

17   (AR 19.)  In assessing any hearing issues, the ALJ noted the "claimant had an audiogram on

18   August 29, 2018 but did not qualify for hearing aids . . . [h]er treating source stated on August

19   26, 2019 that she had had no changes in her hearing since that time." (AR 19.)  The ALJ further

20   stated the following as to treating physician's records related to headaches: "The claimant rated

21   her back pain at a 4/10 on a pain scale, but told her treating physician on December 23, 2019 that

22   it was managed with Ibuprofen . . . [a]lthough she alleged headaches in her Headache

23   Questionnaire . . . she did not complain of any significant headaches to her treating providers."

24   (AR 18.)  Again, while the Plaintiff indeed may have had various treatment records with treating

25   physicians, which the ALJ considered in relation to specific ailments, Plaintiff has not pointed to

26   a treating physician opining as to physical or mental limitations, that the ALJ failed to consider

27   or should have given greater weight to.  The aversions to treating records made by Plaintiff in

28   briefing, and diagnoses of depression, the Court finds were sufficiently addressed in the ALJ's

review of medical records overall, the non-examining physician findings, and reliance on the CE's findings and conclusions.

Again, Plaintiff has not submitted reply briefing that addresses the straightforward contention by Defendant that the record does not contain any treating opinion that was ignored by the ALJ. Again, the section of briefing pertaining to the weighing of physician opinions concludes with the argument that the ALJ erred in relying solely on the CE as a basis for discounting Plaintiff's symptom allegations because an ALJ may not reject testimony solely on the basis of objective medical evidence lacking corroboration, appearing to simply overlap with the previous challenge to the ALJ's credibility determination, which the Court discussed in the previous section. However, even though an ALJ may not solely reject testimony based on a lack of objective medical evidence, the ALJ properly weighed the medical opinions on file, and Dr. Swanson's findings are one factor that the ALJ properly used in evaluating all of the evidence, and properly weighed the opinions of

Accordingly, the Court rejects Plaintiff's vague and generalized challenge, and finds the ALJ did not err in weighing the physicians' opinions in the record, nor by failing to give weight to any of Plaintiff's treating providers.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

**V.**

2

**CONCLUSION AND ORDER**

3        Based on the foregoing, the Court finds that the ALJ did not commit error in: (1) finding

4   Plaintiff did not have a severe impairment; (2) in assessing Plaintiff's subjective pain complaints

5   and testimony; and (3) evaluating and weighing the opinions of Plaintiff's treating physicians,

6   the non-examining physicians, and by relying on the opinion of the consultative examiner.  The

7   Court finds the ALJ's decision to be free from remandable legal error and supported by

8   substantial evidence in the record.  Accordingly, IT IS HEREBY ORDERED that Plaintiff's

9   appeal from the decision of the Commissioner of Social Security is DENIED.  It is FURTHER

10  ORDERED that judgment be entered in favor of Defendant Commissioner of Social Security

11  and against Plaintiff Boonleuang Sengsourignet.  The Clerk of the Court is directed to CLOSE

12  this action.

13

14  IT IS SO ORDERED.

15  Dated:   **June 24, 2022**                                      

                                UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28